IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARGARET S. VILLA,

       Plaintiff,

v.                                                                                  CIV 04-740 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

# **MEMORANDUM OPINION AND ORDER**

       Born in March 1963, Plaintiff Margaret Villa has a tenth grade education. As an adult, she moved around the United States frequently and worked sporadically, primarily in part-time or short-term unskilled positions in the health care industry. She was first diagnosed with depression in 1989 and first began taking anti-depressant and anti-anxiety medications in 1993. In 1994 or 1995, she was diagnosed with Hepatitis C. Between 1993 and 1995, she filed three applications for benefits, each of which was denied and not reopened. *E.g., Administrative Record* ("*Record*") at 13, 17, 81, 84-89, 250-51, 398-404, 422.

       The matter before me involves the application Plaintiff filed in August 2001. *E.g., id.* at 81-83. Administrative Law Judge ("ALJ") C.F. Moore of Dallas, Texas conducted two hearings, the first in New Mexico and the second by telephone with Plaintiff's consent. *See id.* at 389, 426-430, 432, 434. Presiding ALJ Moore found that Plaintiff has the residual functional capacity to perform a limited range of sedentary work and, with the aid of the testimony from a vocational expert, identified three unskilled and sedentary such jobs she can perform – cashier, clerk, and

telephone solicitor. *E.g., id.* at 20-21. The ALJ thus denied benefits at Step 5 under the framework of Medical-Vocational Rules 201.24 and 201.25. *Id.* at 21. After considering additional evidence, the Appeals Council declined review on June 5, 2004, thereby rendering the ALJ's decision final. *See id.* at 5, 8.

Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 3, 8.* This matter is before me on Plaintiff's Motion to Reverse And Remand For A Rehearing, where she asserts that ALJ Moore erred in three respects. *See Docs. 11, 12.* The entire voluminous record has been read and carefully considered. I find Plaintiff's Step 2 argument to be dispositive and that justifies remand to the Commissioner for further proceedings.

## I.  Background

Plaintiff's arguments mainly focus on her mental impairment and her testimony concerning the symptoms she experienced during her year-long Interferon treatment for Hepatitis C. Because there is an interrelationship between Interferon treatment and depression, I discuss those aspects of the record in some detail first, before proceeding to the analysis.

Plaintiff's diagnosis of depression and Hepatitis C are long-standing, although she did work for years with both conditions.[1] As Plaintiff indicates, however, and which Defendant does

---

[1] Plaintiff was diagnosed with depression in 1989 when she was twenty-six years old. *See Record* at 81, 247, 250. Nevertheless, she continued to work at various places throughout the county for four years, apparently without drug or other forms of therapy. *See id.* at 85 (summary of earnings by year); *id.* at 86-88 (listing various employers for each year from 1989 through 1992, including Albuquerque, Carlsbad, and Clovis, New Mexico; California; Florida; and Alabama). Plaintiff was first prescribed various drugs for depression and anxiety in 1993. She first tried counseling in 1995, but evidently did not continue because she found it of no benefit. *See id.* at 250. At some point in 1994 or 1995, Plaintiff underwent a cholecystectomy, or gall bladder removal, at which time her Hepatitis C apparently was discovered. *See id.* at 92, 251, 272, 356. For eight years from 1993 to 2000, Plaintiff worked at various

not contradict, various symptoms are associated with Hepatitis C, including fatigue and musculoskeletal pain. *See Doc. 12 at 11.* An on-line article likewise associates fatigue with the disease.[2] As well as flu-like symptoms and fatigue, some of the noted side effects of Interferon therapy include possible depression and suicide.[3]

---

jobs throughout the country. But 1994, 1995, and 1997, marked years in which she earned no or virtually no income, and around that time she evidently pursued her first three applications for benefits. *See id.* at 84 (applications for benefits alleging onsets of January 1999, March 1993, and July 1997 denied); *id.* at 85 (summary of earnings by year); *id.* at 88-90 (listing various employers for each year from 1993 through 2000, including Ruidoso, Albuquerque, and Clovis, New Mexico; Texas; and North Carolina).

[2] Although the symptoms of Hepatis C can vary,

> most patients (about 75%) experience minimal or no symptoms at the onset of hepatitis C virus. As the hepatitis becomes chronic, most individuals remain asymptomatic (without symptoms). Indeed, many persons with chronic hepatitis C are diagnosed while undergoing routine blood work for unrelated purposes. Infected individuals may exhibit no symptoms despite progressive liver inflammation, necrosis (death of liver cells), and fibrosis (scarring). Other patients may experience chronic or intermittent fatigue and a diminished sense of well-being as a result of advancing disease. On the other hand, fatigue has been described in some individuals with relatively mild disease.

Tse-Ling Fong, M.D., *What are the symptoms of hepatitis C infection?* at http://www.medicinenet.com/hepatitis_c/page4.htm#toce.

[3] The side effects from interferons can include physical and psychological components:

> SIDE EFFECTS: Flu-like symptoms following each injection (fever, chills, headache, muscle aches and pains, malaise) occur with all of the interferons. These symptoms vary from mild to severe and occur in up to half of all patients. The symptoms tend to diminish with repeated injections and may be managed with analgesics such as acetaminophen (Tylenol) and antihistamines such as diphenhydramine (Benadryl).
>
> \* \* \* \* \*
>
> Depression and suicide have been reported among patients receiving interferons; however, it is unclear whether depression and suicidal thoughts are caused by the diseases being treated or the interferons themselves. **Therefore, all patients receiving treatment with an**

3

The last job Plaintiff held was at Presbyterian Healthcare in Clovis as a full-time housekeeper. She worked there until April 2000 when she was fired because of excessive absenteeism that she attributed to her "medical problems and the problems that I was having with my daughters, trying to keep them in school, keeping them from running away." *Id.* at 403. Her primary complaint was fatigue. *E.g., id.* at 403-06. April 2000 thus constitutes Plaintiff's amended alleged onset date in this matter. *See id.* at 90, 394-95.[4]

Soon after she lost her job, Plaintiff's internist, Dr. Mario Trance, received a lab report that indicated some high results in the hepatic panel. *Id.* at 274. A few months later, a September 2000 medical record included in those of Dr. Trance, stated that a doctor needed documents related to her "liver history" and also wanted an updated liver profile along with other tests. This doctor wanted Plaintiff to see a gastroenterologist concerning her liver, and she therefore began seeing Dr. Tahir Qaseem. *See id.* at 272, 289. Later in September, Dr. Trance noted that Plaintiff "feels distressed by her mental problems," *id.* at 288, but about a month later, soon after she began seeing her boyfriend, Plaintiff told him that she was "doing well," *id.* at 287. *See also id.* at 248.

---

> *interferon should be observed for the development of depression and suicidal thoughts.*
>
> Other side effects that may occur with all interferons and which may be caused by higher doses are fatigue, diarrhea, nausea, vomiting, abdominal pain, joint aches, back pain and dizziness. . . .

MedicineNet.com at http://www.medicinenet.com/interferon/article.htm (emphasis added).

[4] Before her attorney was on board, Plaintiff claimed two different onset dates in her application and accompanying materials. The earliest was June 1999, a time frame that corresponds with the date she left another job due to her one of her children's medical needs. In contrast, she also indicated that her depression and Hepatitis C did not cause her to become unable to work until June 2000. *E.g., id.* at 13, 81-83, 92, 112, 160, 394-404, 409-411.

However, in the late Fall 2000 to early 2001, Plaintiff's physicians determined that her chronic Hepatitis C should be treated with Interferon therapy. Although Dr. Trance felt that Plaintiff's depression was "stable," *id.* at 286, and Plaintiff reported Paxil gave her "good results," *id.* at 255, Dr. Qaseem wanted to her evaluated by the University of New Mexico Mental Health Center ("UNMMHC") to "be sure her depression is stable before they put her on interferon," *id.* at 255; *see also id.* at 250.

During Plaintiff's initial visits to UNMMHC in 2001, Dr. Trance believed, and Plaintiff also indicated, that her depression was stable with her medications. *See id.* at 247, 252, 286. According to UNMMHC records, as of the initial referral in February 2001 Plaintiff "[wa]s currently stabilized on Paxil." *Id.* at 252. Nevertheless, Dr. Qaseem wanted to "verify that she is stabilized," *id.*, and he wanted UNMMHC to monitor Plaintiff during the anticipated Interferon treatments "for her depression," *id.* at 247.

Thus, the record reveals early 2001 initial descriptions of stability, Plaintiff's interest in starting the Interferon therapy immediately, her assertions that she was doing well, and UNMMHC's early designation that Plaintiff was either "not at all ill" or "borderline mentally ill" and "psychiatrically stable for interferon therapy." *Id.* at 244. Nevertheless, Plaintiff did not start the Interferon therapy until ***almost one and one-half years later* on September 2002.** *See id.* at 226.

It is not readily apparent whether the delay in starting the Interferon was due to psychological reasons, physiological reasons, or a combination thereof, or whether Dr. Qaseem

5

had Plaintiff under work restrictions at the time.[5]   A November 30, 2001 letter from gastroenterology to Dr. Trance perhaps suggests a physiological reason for the delay: "[Plaintiff's] LFTs have been within normal limits and she is being considered for treatment of hepatitis C virus infection but secondary to the elevated ANA, we would like to repeat a liver biopsy to ensure no autoimmune issue." *Id.* at 212.  On the other hand, according to Plaintiff, Dr. Qaseem told her in April 2001 that he wanted to "hold on Interferon therapy Pt. told that she needs to be stable [psychologically]." *Id.* at 245.  Plaintiff indicated that she was upset about having therapy "put off," and that she was "also interested in working -- [but] needs release from Dr. Qaseem." [6]  *Id.*

Although these records report that Plaintiff was interested in working in the Spring of 2001, she had applied for benefits by August 2001.  Later submissions by Plaintiff suggest that the reason she applied for benefits was because she anticipated her condition to deteriorate further over the course of the Interferon therapy once it began. *See id.* at 118 ("At this time I file for disability because once I begin the [Interferon] treatment I won't be able to [work] and I won't have anyone to [file] for me.")  At the time the application was filed, Plaintiff anticipated that this treatment would begin by the end of that summer. *Id.*  In fact, the ALJ stated that he wanted

---

[5] Part of the reason for this uncertainty may lie in the fact that the record only contains one document from Dr. Qaseem that is dated in 2001, and it is in late 2001 at that.  The lack of records during this period may be because the Administration did not ask Dr. Qaseem to send information until late in the proceedings, and then only asked him for information that long post-dates this time frame. *See id.* at 184 (requesting "RECORDS DATING: APRIL 2002 TO PRESENT").  Likewise, counsel did not supplement with any such records.

[6] According to the UNMMHC medical record, she was to follow up with Dr. Qaseem about obtaining the "work" release. *Id.*  But no medical records specifically indicate whether Dr. Qaseem had indeed placed Plaintiff under a work restriction, when he did so, and/or whether he continued any such restriction and for how long.

6

"updated treatment notes" because "it's not unusual in Hepatitis C case, that a person's ability to function, it actually goes down when they're taking the treatments." *Id.* at 429.  And, Plaintiff testified that during the late 2002 Interferon treatments, she did experience more fatigue and depression, achiness, and nausea and vomiting three days a week that left her bedridden.  *Id.* at 406-09.  The medical records confirm these complaints.  *See, e.g., id.* at 216-17, 220, 222, 226, 276, 330, 340-41, 347-49.

Moreover, even before Plaintiff began the Interferon therapy, the Administration sent Plaintiff to consulting examining psychologist Will D. Parsons.  He interviewed Plaintiff and performed a mental status examination in April 2002.  He concluded:

> Margaret Villa presents as a 5-foot, 7-inch, 206 pound, 39-year-old, Hispanic female.  Her mood is depressed.  Her insight and judgment appeared to be within normal limits, though her affect is mildly labile. . . .
>
> Margaret does report some odd perceptual experiences.  She said, "Before they put me on medications [the report does not ascertain when she began medications], I would hear a doorbell ring in the middle of the night.  I would think I see people and then wouldn't see nobody.  I would hear the doorbell ringing and it wasn't."  She denies that any of those things are going on, currently.
>
> Margaret's rate and flow of speech was unremarkable; and she was oriented as to time, place, person, and situation.  She is not presenting, currently, with any gross, overt psychopathology such as hallucinations, delusions, or disturbances of perception.  As stated earlier, her affect is mildly labile, and she appears to be somewhat depressed currently.  She is receiving appropriate treatment and medications for her depression, however, and apparently has her medical situation well planned out, currently.
>
> . . . Her ability to understand and remember instructions is probably particularly limited.  Her ability to sustain concentration and persist at a task is, however, likely to be moderately limited,

>especially when she is in periods of significant levels of depression. She also has some physical problems associated with hepatitis that may make it difficult for her to work and to be persistent at a task. She also tends to use rather poor judgment in the work situation and may frequently find herself at odds with her supervisors and therefore be terminated.
>
>Margaret's social interactions are likely mildly limited. Her ability to interact with the public, coworkers and supervisors, may vary over time depending upon how depressed she is, then, and how she is doing with her physical problems. She may be somewhat inconsistent with her work attendance and this, as it has in the past, may cause her problems and to lose jobs.
>
>Margaret's ability to adapt to changes in her life is probably mildly limited. Her ability to be aware of normal hazards and to react appropriately is probably not particularly limited, and she does appear able to use public transportation or to travel to unfamiliar places relatively well.
>
>Margaret denies any alcohol or drug use of any kind at the present time. She did not appear to be under the influence of drugs or alcohol at the time of this assessment. It is likely that she would be able to manage her own benefit payments should she receive them.

*Record* at 160-61.

Parsons assessed her with a GAF of 45 and rated her "moderately limited" in sustained concentration and task persistence in carrying out instructions, concentrating, and working without supervision on his Psychiatric - Psychological Source Statement Of Ability To Do Work-Related Activities (Mental-MSS). *See id.* at 162-64.

A month after her visit with Parsons, Plaintiff's gastroenterologist still wanted to "send [her] off [for] a consult for psychiatry to make sure patient is cleared from a psychological

standpoint." *Id.* at 192.  Around this time, on one agency form Dr. J. LeRoy Gabaldon[7] assessed Plaintiff as "appear[ing] to have some limitations in her capacity to interact and to attend/concentrate." *Id.* at 182.  Specifically, he found that she was "moderately" limited in her ability to concentrate, work without distractions, interact with the public, accept instruction or criticism from supervisors, get along with coworkers without distracting them, or "adapt." *See id.* at 180-81.  On that same date in another form, however, Dr. Gabaldon rated Plaintiff as only "mildly" limited in the four "B" criteria for Listings purposes.  *Id.* at 176.

Just before Plaintiff ended the Interferon therapy, she was seen for a consultative examination by Dr. Richard Fink, apparently a psychologist.  *See id.* at 350 (mental status examination conducted July 29, 2003).  He concluded that at that time, she suffered from no more than mild limitations.  *See id.* at 353-55.

## II.  Standard of Review

If substantial evidence[8] supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief.  *E.g., Langley v. Barnhart,* 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003).  My assessment is based on

---

[7] Dr. Gabaldon's credentials are not in the record.  In other opinions I have noted that he is a psychologist.  *See Avila v. Barnhart,* CIV 04-562 KBM (*Doc. 15* at 3); *Hardesty v. Barnhart,* CIV 03-1114 (*Doc. 15* at 6); *Gardom v. Barnhart,* CIV 03-699 KBM (*Doc. 16* at 7); *Chemereteff v. Barnhart,* CIV 01-1293 KBM (*Doc. 16* at 9).

[8] "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin,* 365 F.3d at 1214 (same); *Doyal,* 331 F.3d at 760 (same).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin,* 365 F.3d at 1214 (same).

my "meticulous" review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *Hamlin,* 365 F.3d at 1214; *see also Langley,* 373 F.3d at 1118.

## **III.  Analysis**

At Step 2 of the sequential analysis, the claimant bears the burden of showing, by medical factors alone, that his or her alleged mental impairment "significantly limits" a "basic work activity." If the claimant does not meet that showing, the ALJ can deny benefits for the asserted condition without continuing on to the next steps of the analysis. *E.g., Langley,* 373 F.3d at 1123; *Eden v. Barnhart,* 109 Fed. Appx. 311, 313-14 (10th Cir. 9/15/04); *Cainglit v. Barnhart,* 85 Fed. Appx. 71, 73 (10th Cir. 2003); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1520a(d)(1), 404.1521(a). The regulations define "basic work activities" and include those that pertain to mental impairments: "Understanding, carrying out, and remembering simple instructions;" "Use of judgment;" "Responding appropriately to supervision, co-workers and usual work situations;" and "Dealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b)(3)-(4); *see also Eden,* 109 Fed. Appx. at 313-14; *Cainglit,* 85 Fed. Appx. at 73.

ALJ Moore reviewed the UNMMHC medical evidence and concluded that Plaintiff's

> depression is not "severe," in that it does not significantly limit her physical or mental ability to do basic work activities, including understanding, carrying out, and remembering simple instructions (20 CFR 404.1521 and 416.921). Such conclusion is supported by Dr. Fink's medical source statement, which as noted above, shows that the claimant is under no more than "mild" limitations in her ability to perform various work-related mental activities. Great weight is given Dr. Fink's opinions, which are consistent with the bulk of the mental health progress notes of records. As has been documented above, those progress notes reflect excellent progress from treatment. For example, mental health progress notes from

> 2001 to 2003 indicate that psychiatrically, the claimant was "doing
> well," was feeling "better," was "back to normal" (in October
> 2001), was only "mildly" ill, and was "doing very well" on
> medications (in May 2003). One note indicates that her depression
> had "resolved" (see above). These progress notes are consistent
> with Dr. Fink's assessment. The undersigned gives greater weight
> to Dr. Fink's assessment than to Dr. Parsons' assessment; the latter
> is sometimes inconsistent with progress notes and the record as a
> whole. (The undersigned notes that even Dr. Parsons did not
> identify any "marked" limitations.) Further, a mental health note
> from November 2003 indicates that the claimant was responding to
> treatment (Exhibit B17F).

*Record* at 19-20.

Although he found that Plaintiff's Hepatitis C was a "severe" impairment, ALJ Moore's opinion does not acknowledge the medically-significant relationship between Interferon treatment and depression. That alone would appear to be grounds for reversal.[9] Nor does he discuss whether the long delay in Plaintiff's Interferon treatment was due to Dr. Qaseem's concern that Plaintiff was psychological unstable. As noted above, ALJ Moore did not have all of the medical records necessary to make that determination, specifically the 2001 records of Dr. Qaseem, who apparently was the only physician responsible for delaying the treatment. The unexplained delay in treatment for psychological monitoring also seems to satisfy Plaintiff's burden of showing that she has something "more than the mere presence of a [depressive] condition." *E.g., Hinkle v.*

---

[9] *See Langley,* 373 F.3d at 1123-24 ("the ALJ's decision does not indicate that he considered the cumulative effect of claimant's impairments. At step two, the ALJ must 'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.' 20 C.F.R. § 404.1523. If the claimant's combined impairments are medically severe, the Commissioner must consider 'the combined impact of the impairments . . . throughout the disability determination process.' *Id.* The record shows that claimant suffered from joint disease or fibromyalgia, as well as chronic fatigue, migraines or chronic headaches, depression, and reflux disorder. The ALJ was required to assess the combined impact of these impairments to determine the effect, if any, they had on plaintiff's ability to do work-related activities. His failure to do so requires reversal of the decision.").

*Apfel,* 132 F.3d 1349, 1352 (10th Cir. 1997).

Moreover, ALJ Moore only cites part of the UNMMHC records, which primarily consist of Plaintiff's own descriptions of her mental condition when she was obviously eager to start the Interferon therapy. On the other hand, he does not discuss portions of those same mental health records that assess Plaintiff as "4 -- moderately ill," *see, e.g., Record* at 217, 220, 222, 224, 232, 242, 249, or UNMMHC's initial assessment of a GAF of 50 when first seen, *see id.* at 254. These uncited records tend to **_support_** Dr. Parson's assessment more than a year later in April 2002, that Plaintiff suffered from some moderate limitations and was functioning at a GAF of 45.[10] Furthermore, a GAF assessment of 50 or less is significant at the Step 2 analysis.[11] Despite evidence that Plaintiff was under a work restriction from Dr. Qaseem, that issue was not explored, and Plaintiff's testimony about her unsuccessful attempts to secure employment does not say **_when_** she tried to obtain a job. *See Record* at 245 & 424.

Finally, the ALJ's focus on Dr. Fink's July 2003 assessment long postdates what seems to be the most critical period here, namely from April 2000 through the Interferon therapy. He does not explain whether or how Dr. Fink's report is relevant to that time frame. For all of these reasons, I cannot conclude that ALJ Moore's Step 2 decision is based on the correct legal

---

[10] Although an ALJ need not discuss every piece of evidence, the "record must demonstrate that the ALJ considered **_all_** the evidence." *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996) (emphasis added). "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart,* 362 F.3d 676, 681 (10th Cir. 2004).

[11] *See Lee v. Barnhart,* 117 Fed. Appx. 674 678 (10th Cir. 2004) ("Standing alone, a low GAF score [of 48] does not necessarily evidence an impairment seriously interfering with a claimant's ability to work . . . A GAF score of fifty or less, however, does suggest an inability to keep a job. . . . In a case like this one, decided at step two, the GAF score should not have been ignored."); *see also Langley,* 373 F.3d at 1123 ("GAF score [of] 50, indicat[es] serious symptoms.").

standards or on substantial evidence.[12]

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion is GRANTED, and the matter is remanded to the Commissioner for further proceedings. A final order will enter concurrently herewith.

                                                  _____
                                                  UNITED STATES MAGISTRATE JUDGE
                                                  Presiding by consent.

---

[12] Additionally, even though ALJ Moore made a passing reference to Listing 12.04, *see Record* at 18, I cannot conclude that he went on to consider depression in the residual functional capacity analysis given the way the opinion is written. *E.g., Gonzales v. Secretary of Health & Human Servs.,* 1994 WL 413310 at *1 (10th Cir. 1994) (affirming decision of this Court where ALJ did not rule out mental impairment at Step 2 and went on to consider the condition at issue in Step 4 analysis); *Grant v. SSA,* CIV 02-1166 KBM (*Doc. 17* at 5-6 & n.2; ALJ failure to mention condition at Step 2 held harmless where ALJ considered the condition in Step 4 analysis).